## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO; DISTRICT LODGE 70; and LOCAL LODGE 839, § § § § § | |
| **Plaintiffs** § § | |
| **v.** § § § | Civil Action No. _____ |
| SPIRIT AEROSYSTEMS HOLDINGS, INC. and SPIRIT AEROSYSTEMS, INC., § § § § | |
| **Defendants** § | |

## COMPLAINT

Plaintiffs, International Association of Machinists and Aerospace Workers, AFL-CIO, District Lodge 70 and Local Lodge 839 complain of Defendants, Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., as follows.

### Preliminary Statement

1.     This civil action arises out of Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc.'s repudiation of the express terms of a collective bargaining agreement (*CBA*) with Plaintiffs International Association of Machinists and Aerospace Workers, AFL-CIO, and its affiliated District Lodge 70 and Local Lodge 839.  The CBA obligates Spirit AeroSytems, Inc. to retain ownership and operation of all major manufacturing operations -- and to maintain at least the same number of unit employees -- at its facilities in Wichita, Kansas throughout the duration of the contract. Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc. have repudiated and are continuously breaching material terms of the contract by colluding to sell the entire fabrication operation, failing to require prospective purchasers to

retain unit employees or apply the CBA as conditions of sale, refusing to disclose information pertaining to the planned sale, and refusing to engage in discussions with Union officials to consider options for maintaining workforce levels in Wichita.  The companies have also violated the CBA by their unilateral decision to outsource numerous bargaining unit jobs in various support functions. By these actions, the companies have engaged in a campaign to dismantle the bargaining unit recognized in the contract with the result that at least 1,400 employees are in imminent danger of losing their jobs.

2.     The Union has filed grievances against Spirit AeroSystems, Inc. in accordance with the negotiated grievance and arbitration procedure to redress the Company's systematic violations of the labor contract. The Union is seeking expedited arbitration of both grievances. The Union has brought this civil action seeking a preliminary injunction to maintain the status quo, prevent irreparable injury, and ensure that arbitration is a meaningful remedy when the labor disputes are presented to an arbitrator for determination.

## Parties

3.     Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO (*IAM*), is based in Upper Marlboro, Maryland.  IAM is an international labor organization engaged in representing or acting for employees in an industry affecting interstate commerce as defined in the National Labor Relations Act, as amended, 29 U.S.C. §§ 142(1), (3), and 152(5), (6) and (7).  IAM has a major presence in the aerospace and transportation industries, and it has more than 600,000 active and retired members.

4.     Plaintiff District Lodge 70 (*District 70*) is a labor organization engaged in representing or acting for employees in an industry affecting interstate commerce as defined in

the National Labor Relations Act, as amended, 29 U.S.C. §§ 142(1), (3), and 152(5), (6) and (7). District 70 is based in Wichita, Kansas, and it is affiliated with IAM.

     5.     Plaintiff Local Lodge 839 (*Local 839*) is a local labor organization that is based in Wichita, Kansas and is affiliated with IAM and District 70. Local 839 represents, and at all relevant times has represented, the bargaining unit employees at Spirit AeroSystems' facilities in Wichita.  Local 839 represents approximately 7,100 unit employees at these facilities.

     6.     Defendant Spirit AeroSystems Holdings, Inc. (*Spirit Holdings*) is a corporation organized and existing under the laws of the state of Delaware. Spirit Holdings was incorporated on February 7, 2005. An investor group led by Onex Partners LP and Onex Corporation (jointly *Onex*) is majority owner of Spirit Holdings. Onex controls approximately 62 percent of Spirit Holdings's voting shares. In early 2005, Spirit Holdings acquired The Boeing Company's manufacturing facilities in Wichita, Kansas, Tulsa, Oklahoma and McAlester, Oklahoma. The Company commenced operations on June 17, 2005.

     7.     Defendant Spirit AeroSystems, Inc. (*Spirit* or *Company*) is a wholly-owned subsidiary of Spirit Holdings. Spirit has more than 14,000 employees in six facilities in North Carolina, Oklahoma, Tennessee and Kansas. The Company also operates manufacturing facilities in Scotland, France and Malaysia. Spirit is an employer in an industry affecting interstate commerce within the meaning of the National Labor Relations Act.

## Jurisdiction

     8.     The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185.

## Venue

9.      Venue is proper in this juridical district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Spirit has a major manufacturing facility in Wichita, Kansas, the parties' collective bargaining agreement applies to all operations and unit employees of that facility, and because this action is based on events that occurred in this judicial district.

## Facts

10.      Aerostructures are structural components such as fuselages, propulsion systems and wing systems for commercial and military aircraft. Spirit is one of the largest independent designers and manufacturers of commercial aerostructures in the world, and it is the largest independent supplier of aerostructures to The Boeing Company (*Boeing*). Spirit is also one of the largest independent suppliers of aerostructures to Airbus SAS, a division of European Aeronautic Defense & Space NV (*Airbus*). Boeing and Airbus are the two largest aircraft manufacturers in the world. Spirit's customers also include Sikorsky, Rolls-Royce, Gulfstream, Israel Aerospace Industries, Bombardier, Mitsubishi Aircraft Corporation, Southwest Airlines, Continental Airlines and American Airlines.

11.      In early 2005, Boeing operated its commercial aircraft manufacturing facility in Wichita, Kansas as Mid-Western Aircraft Systems, Inc. In February 2005, Spirit Holdings acquired the facility from Boeing and formed Spirit AeroSystems, Inc. to operate it.

12.      Spirit employees in Wichita build fuselage sections for all current Boeing programs, which includes the 737, 747, 767 and 777 aircraft. The employees also build the struts and pylons for the 737, 747, 767 and 777 aircraft, the Bombardier C Series and the Mitsubishi Regional Jet.

*The Parties' Landmark Collective Bargaining Agreement*

13.     Spirit and the Union have had a collective bargaining relationship in Wichita since 2005. The Union was at all times relevant to this action, and is now, the exclusive bargaining representative of all hourly-rated employees in production and maintenance classifications at Spirit's plant in Wichita, Kansas, excluding certain classifications represented by other bargaining units. The Union also represents hourly-rated timekeepers, installation planners, inspectors and tooling reproduction technicians in other units.

14.     The parties' first collective bargaining agreement was effective 2005 and expired in accordance with its terms June 26, 2010. On March 9, 2010, the parties commenced negotiations for a successor collective bargaining agreement. The parties agreed to follow "a groundbreaking new approach" with respect to the new contract. IAM President R. Thomas Buffenbarger (*Buffenbarger*) expressed the Union's intent "to set the bar and set the stage for a new way of bargaining in the aerospace industry." He recognized that the Union's negotiations with Spirit would "chart the course for [the] industry" and the Union's members. *See generally* Appendix to Complaint, Exhibits 1-9.

15.     Both Spirit and the Union were cognizant of the fact that at that time, contentious labor relations had resulted in four strikes by the IAM against Boeing over a 20-year period.  The parties' contract negotiations in early 2010 occurred soon after an IAM strike against Boeing that impacted many of its customers and suppliers.  *Id*. at App. 11.  Both Spirit and the Union sought to establish a more cooperative and productive relationship.

16.     Union surveys of unit employees prior to negotiations showed that job security ranked as their highest priority.  As a result, the Union's principal objective in the 2010 labor contract negotiations was an agreement that would ensure bargaining unit work preservation and

job security for a lengthy period. Conversely, Spirit's principal objective was a guarantee of labor peace for many years. The negotiations resulted in one of the most extraordinary labor agreements in the history of the aviation industry that was built upon mutual trust, respect, cooperation and transparency.

17.     The duration of the CBA is ten years. This lengthy contract term was unprecedented for the IAM in this industry.  Among other major concessions, the Union gave up its right to strike, accepted lesser general wage increases (only four percent over the period of 10 years), and in some instances even accepted reduced wages.  In exchange, Spirit agreed, among other things, to maintain all major manufacturing operations in Wichita, to preserve or expand all bargaining unit work, to maintain or increase the number of unit employees, and to engage in an open dialogue with the Union regarding any decisions that may affect unit employees throughout the duration of the agreement.

18.     The *Preface* to the CBA reflects the unusual partnership established in the agreement, stating that:

> The Company and the Union have committed to jointly develop an interdependent, mutually beneficial partnership in order to achieve the highest levels of quality and productivity possible. This partnership is based on a commitment to create a new era in labor-management relations. The key goals of the partnership are to improve participation, flexibility, productivity, quality and the financial performance of the Company while enhancing earning opportunities, long-term employment, job satisfaction and safety for employees.

19.     The CBA became effective on June 26, 2010 and will remain in full force and effect until June 27, 2020 in accordance with its terms.  At all relevant times since June 26, 2010, the current CBA has governed the wages, hours of work, and other terms and conditions of

employment of all unit employees. A copy of the CBA is included in the Appendix to Complaint as Exhibit 10 and is incorporated herein by reference.

***Spirit Surreptitiously Implemented Plans to Sell the Fabrication Operation and Eliminate Hundreds of Union Jobs***

20. Ron Eldridge (*Eldridge*) is an Aerospace Coordinator and Don Barker (*Barker*) is a Grand Lodge Representative for the IAM. Vic McMullen (*McMullen*) is Spirit's Vice President, Operations. Justin Welner (*Welner*) is Vice President, Human Resources. Jeff Clark (*Clark*) is Director, Labor Relations. On May 29, 2014, Eldridge and Barker met with McMullen, Welner and Clark to address widespread rumors in the community that Spirit intended to sell all or part of its operations. The Spirit officials informed Eldridge and Barker that Spirit planned to sale its fabrication operation, which would result in a layoff of approximately 1,200 unit employees. The employer's officials further stated that they would provide additional information regarding the sale on the condition that the Union enter into a non-disclosure agreement.  At all times Spirit has sought to cloak its egregious violations of the CBA in secrecy.

21. This information disclosed that after nine consecutive successful years -- built in large measure on the dedication, loyalty, skills and hard work of unit employees -- Spirit had betrayed the Union's trust and had repudiated the central provisions of the CBA. Spirit intentionally concealed its plan to sell the fabrication operation from the IAM even though the Company undoubtedly had previously engaged the usual array of consultants and financial advisors to pursue the sale.

22. Spirit and Union representatives held another meeting on June 19, 2014. The employer's representatives refused to disclose any specific information regarding the sale of the

fabrication operation. They represented that they would provide the Union with a confidential information packet regarding the sale at a later date.

***Relevant Contract Provisions***

23.     Section 1.1 of the CBA is titled *Union Recognition*. In this section, Spirit recognizes the Union as "the sole and exclusive bargaining agent for all employees working in the production and maintenance classifications, excluding classifications currently represented by other bargaining units, employed by the Company at its Wichita, Kansas facility."

24.     Section 17.1 of the CBA is titled *Job Security*.  Section 17.1.1 requires Spirit to provide strategic briefing to the Union on an ongoing basis in order to ensure that the Union has sufficient advance information on all matters necessary to maintain and increase workforce levels in Wichita.

25.     In Section 17.1.2, Spirit agreed to maintain major manufacturing operations and union jobs in Wichita as long as the contract is in effect. Additionally, Section 17.1.2.a provides that unit work in major programs will continue to be performed by bargaining unit employees unless a particular program is relocated out of Wichita, which would occur only to make capacity available for a new or expanded program.

26.     Section 17.1.2.b expresses the parties' intent to maintain and expand the workforce in Wichita. This section also requires Spirit to inform the Union if the Company "begins to consider options for selling or outsourcing a major work statement being produced at that time in the Wichita plant by IAM bargaining unit members."  And Section 17.1.2.b provides that if Spirit does consider selling a major unit or function, it will work cooperatively with the Union to consider options for maintaining workforce levels in Wichita.

27.     Section 17.2 of the CBA is titled *Joint Partnership and Specific Subject Matter Committees*.  In accordance with this section's mandate, Spirit and the Union established a Joint Partnership Committee (*JPC*) "to support the intention of [the contract] and jointly address mutually agreed upon topics to further the health of the Company and keep the team for the future intact."  The section affirms that "the parties intend the JPC to form the basis for honest and meaningful dialogue."

28.     Section 17.1.2.c provides that the Joint Partnership Committee (created in Section 17.2) is to play a valuable role in the processes by which Spirit complies with the intent of the CBA.

29.     Section 17.3, titled *Workplace Steward-Manager Partnership*, manifests the parties' agreement "to work to establish an ongoing robust communication process throughout all levels of management that provides timely and informative information to members of the bargaining unit."

30.     Section 17.4 of the CBA is titled *Successorship*. This section expresses the unequivocal intent of the parties that the CBA will remain in effect for its full term and that it shall bind Spirit's successors.

31.     By failing to give the Union any notice or information when it began to consider options for selling its fabrication assets, and by failing to provide the Union with strategic briefing regarding the matter, Spirit violated, and continues to violate on an ongoing basis, Sections 17.1, 17.1.1, 17.1.2., 17.2 and 17.3 of the CBA. Spirit has also breached the recognition clause (section 1.1), Article 2, and the *Preamble*, *Preface*, and *Contract Reaffirmance* provisions.

32.     Section 7 of the CBA sets forth the parties' grievance and arbitration procedures. Section 7.2 establishes the grievance framework, including four steps that culminate in final and

**Complaint – Page 9**

binding arbitration. Section 7.4 addresses the procedure for unit-wide grievances between the Union and Company and provides in pertinent part:

> In the case of any grievance which the Union may have against the Company or the Company may have against the Union, the processing of such grievance shall begin with Step 3 and shall be limited to matters dealing with the interpretation or application of terms of this Agreement. Such grievance shall be submitted in writing to the designated representative of the Company or the designated representative of the Union.

33.     Step three of the grievance procedures requires a mutual decision of the Union Business Representative and the Company's designated representative. The contract provides that the Union Business Representative and Company representative will review and discuss the written grievance.  Any mutual decision reached will be signed by the parties and is final and binding. If the dispute is not resolved within ten work days (or longer if extended by mutual agreement), then both the Union Business Representative and Company representative must sign the grievance, indicating that they reconsidered the matter and that no resolution could be negotiated. If no settlement is reached, then within ten workdays thereafter either party may request in writing that the dispute be submitted to arbitration.

34.     By letter dated July 17, 2014, Buffenbarger informed Robert D. Johnson, Chairman of the Board of Directors, that Spirit's betrayal should be promptly addressed. Buffenbarger requested a meeting with Johnson and all directors in the near future. To date Spirit has failed to respond to the IAM President's correspondence.

35.     On August 5, 2014, the Union submitted a grievance to Spirit seeking redress for the systematic violations of the CBA. A copy of the grievance is included in the Appendix as Exhibit 11 and is incorporated herein by reference.

36.     The Union requested Spirit to expedite arbitration of the grievance in view of the imminent plan to eliminate 1,200 bargaining unit jobs in violation of the CBA and to delay the sale pending arbitration. Spirit has refused to delay the sale of its fabrication operation, even temporarily pending arbitration, as the Company is seeking to consummate a sale before the matter can be heard by an arbitrator.

37.     Section 7.6 of the CBA requires the parties to meet and attempt to agree on an arbitrator within ten workdays after submission of the written request for arbitration. In the event the parties cannot agree on an arbitrator, Section 7.7 requires them to select an arbitrator from a permanent panel established by the parties subject to their availability.

38.     Spirit is not requiring any prospective buyer, as a condition of sale, to retain any bargaining unit employees or to apply the CBA to the fabrication operation post sale. Moreover, Spirt has represented that prospective buyers are free to move the fabrication operation off-site following a sale. Upon closure of a sale, Spirit would be incapable of fulfilling its contractual obligation to preserve unit jobs and work throughout the duration of the CBA. The sale would result in the permanent loss of such work and approximately 1,200 unit employees would lose their jobs. Consequently, Spirit's sale of the fabrication operation would irreparably harm all affected employees who would lose their jobs, their wages and their employment benefits.

39.     The Union would suffer further irreparable harm if the status quo is not maintained pending arbitration for the reason that the Union would be unable to fulfill its duty to provide effective representation in the arbitration for affected unit members.

40.     Once the sale has been consummated, no arbitrator would have the power to order the buyer to return the work to the bargaining unit because any such buyer is not a party to the CBA. Spirit's conduct in this respect is designed to frustrate arbitration and render it meaningless

**Complaint – Page 11**

as a remedy.  The arbitrator would be unable to restore the status quo ante and place the parties in the positions they held prior to Spirit's egregious violations of the CBA. The arbitrator would then be presented with a *fait accompli* and arbitration would be a hollow formality.  Arbitration, the contractual remedy, would be inadequate.

***Spirt Plans to Outsource Many Additional Union Jobs in Support Functions***

41.     Steve Turkel (*Turkel*) is the Company's Logistics Director. Frank Molina (*Molina*) is President-Directing Business Representative of District 70.  In June 2014, Clark and Turkel informed Molina that Spirit planned to outsource more than 200 unit jobs in shipping, tools supply, paint stores, and other support functions and lay off the unit employees.

42.     On July 25, 2014, Molina conferred again with Clark and Turkel regarding the support functions outsourcing decision.  When Molina asked why Spirit made the decision to outsource the jobs, the Company officials stated that Spirit "just didn't want to do the work" and that Spirit would not realize any cost savings. The CBA prohibits Spirit from any subcontracting unless it becomes necessary for financial reasons or to make room for additional work.

43.     Section 14.6 of the CBA is designated *Subcontracting*.  The section provides that Spirit will notify the Union whenever any outsourcing plans that may impact bargaining unit jobs are developed or considered.  The express reason for such notice is to provide the Union with an opportunity to propose competitive alternatives which would allow retention of the bargaining unit work.  By disclosing that outsourcing certain support functions would not reduce any costs, Spirit conceded that the decision breached the CBA.

44.     Spirit's unilateral decision to outsource more than 200 bargaining unit jobs in a patent breach of the CBA. At the same time, the employer has denied that such outsourcing will

result in any cost savings or otherwise advance any purported business justification.   The employer has disclosed no purported reason for the decision.

45.     On August 6, 2014, the Union presented a grievance seeking redress for the contract violation.  The Union requested Spirit to expedite arbitration of the grievance in view of the imminent elimination of more than 200 bargaining unit jobs in violation of the CBA.  A copy of the grievance is included in the Appendix as Exhibit 12 and is incorporated herein by reference.

46.     Spirit is not requiring any prospective subcontractor, as a condition of the planned transaction, to retain any bargaining unit employees or to apply the CBA to the support functions. Upon closure of a subcontracting arrangement, Spirit would be incapable of fulfilling its contractual obligation to preserve unit jobs and work throughout the duration of the CBA. The sale would result in the permanent loss of such work and more than 200 unit employees would lose their jobs. Consequently, Spirit's outsourcing of support functions would irreparably harm all affected employees who would lose their jobs, their wages and their employment benefits.

47.     The Union would suffer further irreparable harm if the status quo is not maintained pending arbitration for the reason that the Union would be unable to fulfill its duty to provide effective representation in the arbitration for affected unit members.

48.     Once the support functions outsourcing agreement has been consummated, no arbitrator would have the power to order the subcontractor to return to return the work to the bargaining unit because any such subcontractor is not a party to the CBA. Spirit's actions in this regard are designed to frustrate arbitration and render it meaningless as a remedy.  The arbitrator would be unable to restore the status quo ante and place the parties in the positions they held prior to Spirit's patent violations of the CBA. The arbitrator would then be presented with a *fait*

*accompli* and arbitration would be a hollow formality. Arbitration, the contractual remedy, would be inadequate.

## Count One -- Injunction in Aid of Arbitration

49.     The Union incorporates paragraphs 1 to 48, inclusive, by reference as if such paragraphs were fully set forth verbatim herein.

50.     Count One is asserted against both Defendants, jointly and severally.

51.     The Union invokes the Court's equity power to issue injunctive relief in aid of labor arbitration.

52.     In accordance with Fed. R. Civ. P. 65, the Union seeks, after hearing, issuance of a preliminary injunction restraining and enjoining Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their directors, officers, employees, agents, representatives, and those acting in concert or participation with them, and Spirit AeroSystems, Inc. from proceeding with any activities or efforts to sell the fabrication operation or any fabrication assets pending arbitration of the Union Grievance and issuance of the arbitrator's decision and award.

53.     The Union further seeks a preliminary injunction restraining and enjoining Spirit Aerosystems, Inc. from laying off any unit employees who perform work in the fabrication unit pending arbitration of the Union Grievance and issuance of the arbitrator's decision and award.

54.     The Union is further entitled to a preliminary injunction restraining and enjoining Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their directors, officers, employees, agents, representatives, and those acting in concert or participation with them, and Spirit AeroSystems, Inc. from proceeding with any activities or efforts to outsource any unit support functions pending arbitration of the second Union Grievance and issuance of the arbitrator's decision and award.

55.     The Union is further entitled to a preliminary injunction restraining and enjoining Spirit Aerosystems, Inc. from laying off any unit employees in job classifications performing support functions pending arbitration of the pertinent Union Grievance and issuance of the arbitrator's decision and award.

56.     Immediate, substantial and irreparable injury to the contractual and property rights of the Union and more than 1,400 represented employees will result unless the requested relief is granted promptly.

57.     As to each item of relief, greater injury will be inflicted on the Union by the denial of relief than will be inflicted upon Spirit by the granting of relief.

58.     The Union has no adequate remedy at law.

59.     The Union has fulfilled all obligations imposed by law in this labor dispute and has made every reasonable effort to settle the dispute by negotiations prior to the filing of this complaint.  The Union has informed Spirit of its decision to invoke arbitration in this dispute, and the Union's grievances are subject to final and binding arbitration under the CBA. Arbitration would be futile and would be rendered a hollow formality unless the Court grants injunctive relief to maintain the status quo pending arbitration. Accordingly, the only remedy available to the Union that would be substantial, complete and adequate to prevent irreparable injury is the equitable remedy of a preliminary injunction to maintain the status quo until an arbitrator has rendered a decision with respect to each Union Grievance.

### Prayer

WHEREFORE, Plaintiffs International Association of Machinists and Aerospace Workers, AFL-CIO, District Lodge 70 and Local Lodge 839 request the following relief:

1.     The Court enter an order setting a date for an expedited hearing on Plaintiffs' motion for preliminary injunction and requiring Defendants to appear and show cause why a preliminary injunction in this matter should not be granted;

2.     The Court grant a preliminary injunction at the conclusion of the hearing, restraining and enjoining Defendants Spirit AeroSystems Holdings, Inc. and Spirit AeroSystems, Inc., their officers, employees, agents, representatives, and those acting in concert or participation with them, to cease and desist from (a) proceeding in any manner whatsoever to sell the fabrication operation or any fabrication assets pending final arbitration of the Union's grievance and further order of this Court; (b) proceeding in any manner whatsoever to insource any unit jobs or work functions pending final arbitration of the Union's grievance and further order of this Court; and (c) laying off any unit employees who perform work in the fabrication unit or whose jobs are intended to be insourced pending final arbitration of the Union's grievance and further order of this Court;

3.     The Union be awarded reasonable attorneys' fees and costs of court; and

4.     The Court grant such other and further relief to which the Union may be justly entitled.

Dated August 8, 2014.

Respectfully submitted,

/s/Tom E. Hammond
**Tom E. Hammond**
Kansas Bar No. 10242
**Hammond, Zonker & Farris, LLC**
Post Office Box 47370
Wichita, Kansas 67201
316.262.6800 (phone)
316.262.3770 (fax)
tehammond1@yahoo.com

**Rod Tanner** [Motion Pro Hac Vice Pending]
Texas Bar No. 19637500
rtanner@rodtannerlaw.com
**Joshua R. Kersey** [Motion Pro Hac Vice Pending]
Texas Bar No. 24090206
jkersey@rodtannerlaw.com
**Tanner and Associates, PC**
6300 Ridglea Place, Suite 407
Fort Worth, Texas 76116-5706
817.377.8833 (phone)
817.377.1136 (fax)

**Complaint – Page 16**